STATE OF CONNECTICUT *v.* ANGEL LUIS ORTIZ
(SC 15786)

STATE OF CONNECTICUT *v.* JULIO
DIAZ-MARRERO
(SC 15670)

McDonald, C. J., and Norcott, Katz, Sullivan and Peters, Js.

Argued December 2, 1999—officially released March 17, 2000*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant in the first case).

*Louis S. Avitabile*, special public defender, for the appellant (defendant in the second case).

* March 17, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee in both cases (state).

*Opinion*

NORCOTT, J. After a joint jury trial, the defendants, Angel Luis Ortiz and Julio Diaz-Marrero, were each found guilty of one count of capital felony in violation of General Statutes §§ 53a-54b (8)[1] and 53a-8;[2] two counts of capital felony in violation of §§ 53a-54b (5)[3] and 53a-8; two counts of murder in violation of General Statutes §§ 53a-54a (a)[4] and 53a-8; two counts of felony murder in violation of General Statutes § 53a-54c;[5] one count of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a);[6] two

---

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . ."

[4] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[5] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[6] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

counts of kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) (2) (A), (B) and (C)[7] and 53a-8; one count of robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4)[8] and 53a-8; one count of conspiracy to commit kidnapping in the first degree in violation of §§ 53a-92 (a) (2) (A), (B) and (C) and 53a-48 (a); and conspiracy to commit robbery in the first degree in violation of §§ 53a-134 (a) (4) and 53a-48 (a).[9] The trial court sentenced Ortiz to a total effective sentence of life imprisonment without the possibility of release, and Diaz-Marrero to a total effective sentence of life imprisonment without the possibility of release plus forty years imprisonment. Both defendants have appealed their judgments of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3).[10]

The jury reasonably could have found the following facts. In the late hours of July 27, 1994, and into the

[7] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person . . . ."

[8] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery . . . he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

[9] The defendants argue and the state concedes that the three conspiracy convictions violated their constitutional protections against double jeopardy. See *State* v. *Howard*, 221 Conn. 447, 460–63, 604 A.2d 1294 (1992). Consequently, as we discuss in part I D of this opinion, the judgments as to the three conspiracy counts are remanded to the trial court with direction to combine the three conspiracy convictions and to vacate the sentences for two of the conspiracy convictions.

[10] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

early hours of July 28, 1994, the defendants carried out a plan to kidnap, rob and kill Hector Alvarado (Alvarado), and his wife Migdalia Bermudez (Bermudez). The victims were abducted and robbed in Hartford, and then taken to Rocky Hill where they were executed by Diaz-Marrero with a twelve gauge shotgun. Alvarado was shot in the head and he died instantly. Bermudez was shot in the back, hips and buttocks, she was left for dead in the travel portion of the road, and she died approximately five hours later at Hartford Hospital.

Alvarado was a known drug dealer, who conducted an illegal drug selling operation, with the assistance of Ortiz, at a residential apartment building located at 66 Webster Street in Hartford. Ortiz was Alvarado's brother-in-law, and he lived at 66 Webster Street. Alvarado had requested that Ortiz build a secure box in which Alvarado could store his drugs and money. Accordingly, Ortiz built the secure box and Alvarado kept it in the basement of his home at 109 Adelaide Street in Hartford.

Diaz-Marrero had come to Hartford from Caguas, Puerto Rico, a few weeks prior to the murders. He stayed for approximately one week at 66 Webster Street with Wilson Rodriguez, who was another resident of the building. At trial, Wilson Rodriguez testified that on July 26, 1994, shortly after Diaz-Marrero had stopped staying with him, his apartment was burglarized and two shotguns and a rifle were stolen. Before the jury, Wilson Rodriguez identified the guns that were found near the crime scene as those that had been stolen.

On Wednesday, July 27, 1994, at 8:30 p.m. and again at 9:30 p.m., Diaz-Marrero and Ortiz went to the home of Alvarado's mother, Maria Cruz Rodriguez (Rodriguez), looking for Alvarado. Later that night, a van driven by Ortiz stopped on Park Street in Hartford and Diaz-Marrero, who was in the van, asked Ramon Caraballo

if he wanted to buy some drugs. Caraballo knew Diaz-Marrero as "Tongo" and testified that they occasionally had used drugs together. Caraballo got into the van and sat in the front seat next to Ortiz.

Another resident of 66 Webster Street, Jesus Roman, who also knew Diaz-Marrero as "Tongo," testified about the events that occurred on the evening of the murders. According to Roman's testimony, at 11 p.m., Tongo pulled up in a van and asked Roman if Alvarado was around and if he had drugs. Roman told him that Alvarado was around and that he had drugs, and Roman offered to buy the drugs for Diaz-Marrero. Diaz-Marrero declined Roman's offer, saying that he wanted to deal with Alvarado directly and he asked Roman to tell Alvarado that Diaz-Marrero would be waiting for him on Campfield Avenue.

Roman conveyed Diaz-Marrero's message to Alvarado and offered to go along. The two men and Bermudez then drove in Alvarado's car to Campfield Avenue and parked behind the van. Diaz-Marrero exited the van, walked toward Alvarado's car and asked him to step out of the car so they could speak alone. Alvarado and Diaz-Marrero walked to the front of the van and Roman and Bermudez exited the car. As Alvarado returned to his car, Diaz-Marrero, holding a shotgun, walked toward Alvarado, Bermudez and Roman. Diaz-Marrero took Bermudez by the arm and fired the shotgun into the sidewalk. Just as Diaz-Marrero fired the shotgun into the sidewalk, Caraballo, who was attempting to leave the scene and had just opened the door of the van and placed a foot on the ground, was struck in the throat by a ricocheting shotgun slug or pellet. Roman saw Diaz-Marrero take Bermudez, who was crying, and put her into the van. Still armed, Diaz-Marrero returned for Alvarado, who took money out of his pocket and offered it to him. Roman then saw Alvarado return the money to his pocket and watched

Diaz-Marrero point the shotgun at Alvarado, take him by the arm and lead him into the van. Roman watched the van drive away, turning left onto Adelaide Street.

Caraballo, who had reentered the van after being shot, testified that although he was injured and bleeding, he was also alert and conscious. He claimed that Diaz-Marrero had said "[l]et's go to the man's house." The van stopped a short distance later in front of an apartment building and Diaz-Marrero, still armed with the shotgun, took Alvarado out of the van and into the apartment building. Caraballo, Ortiz and Bermudez stayed in the van. Several minutes later, Diaz-Marrero and Alvarado returned to the van. Diaz-Marrero carried a paper bag, which he then handed to Ortiz. Diaz-Marrero then ordered Ortiz to drive off.

The van traveled through some traffic lights and then entered a highway. After the van had traveled a short distance, it stopped near the side of the road. Diaz-Marrero exited the van and ordered the victims to get out and they complied. Caraballo and Ortiz remained in the van. Several shots were then fired. Diaz-Marrero returned to the van without the victims and said to Ortiz, "[l]et's get out of here." A few minutes later, Diaz-Marrero threw the shotguns out the passenger side window of the van. The van then returned to Hartford. Caraballo was let out on Park Street.[11]

On July 29, 1994, a Rocky Hill teenager discovered a shotgun in the grass by the side of Route 3. The police were summoned, they seized the shotgun, and they then discovered and seized the sawed-off stock and a second shotgun that was found nearby. Both shotguns were twelve gauge: one was a sawed-off ERA double-barreled shotgun, and the other was a High Standard single-

---

[11] After Caraballo had exited the van, some acquaintances found him and took him to Saint Francis Hospital where he was operated on and remained for approximately one week.

barreled shotgun. Several discharged shells found at the scene were determined to be Winchester Super X double-O buck shotgun shells fired from the High Standard shotgun. Bermudez had been shot with both double-O buckshot and birdshot. The recovered ammunition components were consistent with the ammunition stolen from Wilson Rodriguez' apartment.

Aida Bermudez, the sister of both Bermudez and Ortiz, testified that at Bermudez' wake on July 31, 1994, Ortiz told her certain details about the murders. She testified that Ortiz told her the following information: that three men in a van had kidnapped and killed the victims; that the victims had been picked up on Webster Street and taken to Campfield Avenue where a gun was fired into the sidewalk and pointed at Alvarado, who was then forced into the van; that Bermudez was not an intended victim but was nevertheless forced into the van; that the victims were taken to their home and forced into the basement, where the men believed that drugs and money were stored in a wooden box; that drugs and money were stolen; that the victims were taken in the van to Rocky Hill; and that Bermudez was shot when she tried to flee her abductors.

Diaz-Marrero left Connecticut shortly after the murders. A police officer from Caguas, Puerto Rico, testified that he saw Diaz-Marrero in Caguas on August 1, 1994. Ortiz also left Connecticut and was arrested in New Jersey on August 31, 1995.

Both defendants argue on appeal that the trial court improperly: (1) refused to grant them a new probable cause hearing despite the state's failure to disclose in a timely manner certain exculpatory evidence; (2) refused to suppress the photographic identification of Diaz-Marrero by Rodriguez on the ground that it was overly suggestive; (3) deprived the defendants of their right to confront witnesses by refusing to conduct an

in camera review of Rodriguez' psychiatric records; (4) rendered judgments of conviction on three counts of conspiracy and sentenced the defendants separately for each conviction, thereby violating the constitutional prohibition against double jeopardy; and (5) refused to instruct the jury regarding the credibility of Caraballo.

In addition, each defendant raises distinct issues relevant to his own case on appeal. Ortiz argues: that the trial court improperly refused to allow him to present evidence of a third party's culpability; that he was denied his right to a speedy trial; that the trial court improperly refused to grant him a new trial on the basis that the evidence presented was clearly insufficient to warrant a jury verdict of guilty; and that the trial court provided the jury with an improper instruction on the presumption of innocence and reasonable doubt, thereby tainting the verdict. Finally, Diaz-Marrero argues that the trial court improperly consolidated the cases against him and Ortiz; and that the trial court incorrectly instructed the jury regarding the two witness rule. We affirm the judgments of conviction on all counts except for the three conspiracy counts, which we reverse and remand to the trial court with direction to combine the three conspiracy convictions and to vacate the sentences for two of the conspiracy convictions.

I

CLAIMS OF ORTIZ AND DIAZ-MARRERO

We first consider the claims raised by both defendants, namely, that the trial court improperly: (1) refused to grant them a new probable cause hearing despite the state's failure to disclose in a timely manner certain exculpatory evidence; (2) refused to suppress the overly suggestive identification of Diaz-Marrero by Rodriguez; (3) refused to conduct an in camera review of Rodriguez' psychiatric records; (4) violated the con-

stitutional prohibition against double jeopardy by convicting and rendering judgment against the defendants on three separate counts of conspiracy; and (5) refused to give the requested instruction to the jury regarding the credibility of Caraballo. We reject all of these claims except for the claim of double jeopardy.

## A

### Alleged Withholding of Exculpatory Evidence

The defendants claim that they are entitled to new probable cause hearings because the state allegedly withheld certain exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We disagree.

Each defendant claims that the suppression of two separate pieces of exculpatory evidence deprived him of a fair probable cause hearing. The evidence in question is an exculpatory police report and the complete statement of one witness, Angel Romero.

### 1

We consider the police report first. The following facts are relevant to this claim. Diaz-Marrero's probable cause hearing began on June 8, 1995, and concluded on June 13, 1995. Ortiz' probable cause hearing was held on January 3 and 4, 1996. On November 19 or 20, 1996, the state disclosed a police report signed by Hartford Police Detective Carlos Santiago. The report indicated that a Rocky Hill police detective had told Santiago that a police officer in Rochester, New York, had told him that an informant named Avario Sanchez had said that a third party named Carlos Rivera had admitted to Sanchez that he had killed a man and a

woman in the Hartford area in 1994.[12] The court found that the report was exculpatory and the state conceded that it was "potentially exculpatory."[13]

Diaz-Marrero argued that the defendants were prejudiced by the late disclosure of the report because they could no longer find the witnesses involved. He claimed that if the report had been available at the probable cause hearings, the defendants could have made an offer of proof that Rivera had admitted to committing the murders. He represented that he currently was attempting to follow Rivera's trail, but that it was cold. Ortiz also represented that he had been pursuing relevant information about Rivera.

The court denied both the motion for a new probable cause hearing and the motion for a new trial, holding that even if the full police report had been offered at either of the defendants' probable cause hearings, it would have been insufficient to rebut the findings of probable cause. We agree with the trial court.

"This court has long held, on the basis of *Brady* v. *Maryland* [supra, 373 U.S. 83], and its progeny, that [s]ince the adversarial probable cause hearing [mandated by article first, § 8, of the Connecticut constitution as amended] . . . is an essential part of a

---

[12] Santiago's report included the following: "[Detective] Henry Dodenhoff from the Rocky Hill Police Department . . . stated that he received information from Officer O'Brien of the Rochester, New York Police Department, that he is working with an informant by the name of Avario Sanchez D.O.B. 5/27/75, who told him that one (Carlos Rivera of an [unknown] address in Rochester, N.Y., told him [personally] that he killed [two] people in the Hartford area sometime [last] summer and that the [victims] were a Hispanic male and a Hispanic female. According to Officer O'Brien (Carlos Rivera) is presently staying with his girlfriend one Edna Colon. Officer O'Brien is gong to contact [Detective] Dodenhoff as soon as possible with Carlos Rivera's address or his girlfriend's address."

[13] While Diaz-Marrero formally moved for a new probable cause hearing and to dismiss the case, Ortiz did not. Ortiz, however, joined Diaz-Marrero's motions before the court on December 17, 1996.

defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time. . . . [I]n *State* v. *Shannon*, 212 Conn. 387, 406, 563 A.2d 646 [cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512] (1989), we held that in order for this court to consider claims of nondisclosure of exculpatory material at a probable cause hearing required by our state constitution, the defendant must demonstrate: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material. . . . We further held, in *Shannon*, that the materiality of such exculpatory evidence is to be determined by utilizing the test set forth in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)." (Citation omitted; internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 52, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1985). Under the *Bagley* test, nondisclosed exculpatory evidence will be considered material only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *Ross*, 251 Conn. 579, 595, 742 A.2d 312 (1999).

In the present case, the state concedes that the police report was suppressed and that it was "potentially exculpatory" to the defense. The state contends, however, that the defense does not satisfy the third prong under the *Bagley* test: that the evidence was material in that there was a reasonable probability that, had there been disclosure, the result of the probable cause hearing would have been any different. We agree with the state.

"The determination of materiality has been said to be 'inevitably fact-bound' and like other factual issues

is committed to the trial court in the first instance. *United States* v. *Kelly*, 790 F.2d 130, 136 (D.C. Cir. 1986)." *State* v. *Pollitt*, 205 Conn. 132, 147, 531 A.2d 125 (1987). "In evaluating the 'reasonable probability' standard, we should be aware of what adverse effect the nondisclosure may have had on the defendant's preparation or presentation of his case and that we should act 'with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have [otherwise] taken . . . .' *United States* v. *Bagley*, supra, [473 U.S. 683]. On the other hand, we must also recognize that the 'mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish "materiality" in the constitutional sense.' . . . *State* v. *Mak*, 105 Wash. 2d 692, 704–705, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S. Ct. 599, 93 L. Ed. 2d 599 (1986). There is a difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits such as this; this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence." (Emphasis in original.) *State* v. *Pollitt*, supra, 148–49.

After a careful review of the record, we conclude that there is not a reasonable probability that the disclosure of Detective Santiago's report prior to either of the defendants' probable cause hearings would have affected the outcome of those hearings. Significantly, Santiago, whose report the defense claims was wrongfully withheld, did not testify at the probable cause hearing. Additionally, there were no witnesses who testified at the probable cause hearing who possibly could have been asked about the contents of the report. As the trial court noted, "[h]ad the defense made an offer of proof based on third party culpability, such an offer of proof would have been insufficient under the statute

to rebut the finding of probable cause, and the defense would not have been permitted to offer third party culpability evidence at the probable cause hearing. Finally, with the hindsight of trial having been completed, the court notes that there was not a scintil[l]a of evidence pointing toward third party culpability that met, in the court's opinion, our standards of admissibility."[14]

Furthermore, the defendants have failed to satisfy this court's long held principle that even if we assume, arguendo, that there had been a tainted probable cause hearing, if the defendant subsequently was not deprived of his constitutional right to a fair trial, then the tainted probable cause hearing was harmless beyond a reasonable doubt. *State* v. *McPhail*, 213 Conn. 161, 171, 567 A.2d 812 (1989); see *Chapman* v. *California*, 386 U.S. 18, 22–23, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967). In *State* v. *McPhail*, supra, 170, we held that, despite the state's withholding of exculpatory evidence that, with reasonable probability, would have altered the result of the defendant's probable cause hearing, there was no need for a new trial. "[W]e conclude that where, as here, there has been a failure to disclose exculpatory evidence at a criminal defendant's probable cause hearing, the proper inquiry is not whether there exists a

[14] General Statutes § 54-46a provides in relevant part: "(a) No person charged by the state . . . shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. . . .

"(b) . . . At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence *unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.* . . ." (Emphasis added.)

reasonable probability that the undisclosed evidence would have changed the outcome of that hearing, but rather, whether the nondisclosure did in fact taint the defendant's subsequent prosecution." Id.[15]

In the present case, the defendants claim that because the state withheld exculpatory evidence at the probable cause hearings, they are entitled to a new hearing and a new trial. There was, however, ample evidence presented at trial that both defendants had received the previously withheld evidence in time for trial, thereby discounting their argument that the evidence was disclosed too late for them to develop defenses dependent upon the evidence. Evidence was presented that Rivera was wanted for other crimes and that his whereabouts were unknown. Therefore, the defendants' claim that they could have pursued information pertaining to Rivera is purely speculative. Additionally, even if Sanchez, the informant cited in the police report, had been introduced at the probable cause hearings, his hypothetical testimony linking Rivera to the crime would have been inadmissible hearsay. Accordingly, we disagree with the defendants' claim that the disclosure of the police report occurred too late for them to develop their respective defenses and, consequently, deprived them of their constitutional right to a fair trial.

2

We turn now to the second piece of exculpatory evidence that the defendants claim was improperly sup-

___

[15] The defendants argue that *State* v. *McPhail*, supra, 213 Conn. 161, should be overruled. This court recently considered the same request in *State* v. *Sinchak*, 247 Conn. 440, 441, 721 A.2d 1193 (1999). In *State* v. *Sinchak*, supra, 441–42, by a per curiam opinion, we held that "[t]he rule of *State* v. *McPhail*, supra, [161], best would be addressed in conjunction with the rules set forth in *State* v. *Boyd*, 214 Conn. 132, 570 A.2d 1125 (1990), and *State* v. *Mitchell*, 200 Conn. 323, 512 A.2d 140 (1986). The continued validity of the rules of *Boyd* and *Mitchell*, however, was not certified and, therefore, not briefed or argued in this case." As the same holds true for the present case, we decline to address this issue here.

pressed by the state: the complete statement of Romero. The defendants claim that this statement contained exculpatory information indicating that Caraballo was involved in the murders. They argue that, as a result of the denied access to the full report, they were unable to impeach Caraballo's testimony at the probable cause hearings and, conversely, they were unable to make an offer of proof of Caraballo's third party culpability.

The following facts are relevant to this argument. Alvarado's brother-in-law, Romero, spoke with the police on April 19, 1995, and provided them with various pieces of information set forth in a typed, six page statement. The following excerpt from Romero's statement was disclosed by the state to the defendants at the probable cause hearing: "About one week after the homicides, I saw a kid in Hartford talking to a street person . . . [named] Passetta. . . . Passetta told me another person involved in the murders was JOCIAN. He is a guy who cuts hair, and lived on School Street in Hartford. He was arrested many times in Hartford. He disappeared, and I heard he is in the Bronx or San Francisco. Jocian knew Alvarado. Jocian was a known user of cocaine and had a lot of tattoos." The state did not attribute this statement to Romero. During argument, the state revealed that the kid referred to in the statement was Caraballo and that the woman named Passetta was dead. The court marked Romero's complete statement as an exhibit, examined it in camera and found nothing exculpatory. Caraballo did testify at the probable cause hearings and was questioned about this excerpt from Romero's statement. Specifically, Caraballo testified that he did not know a woman named Passetta, that he had not spoken with her about the murders, and that he did not regain the use of his voice until four months after the shooting.

The complete statement was disclosed to the defendants on February 25, 1996, well before the start of

trial. Caraballo testified at trial that he did not know a person named Passetta, that he did not recognize the name Jocian, and that he did not know a man who cut hair and had tattoos. Romero also testified for the state. Upon completion of Romero's testimony, Ortiz sought to call him as a defense witness and to question him about his statement concerning the conversation between Passetta and Caraballo. After a voir dire examination, however, the trial court denied Ortiz' motion to call Romero out of order. Indeed, Romero told the court he was willing to testify again, during the defendants' case. Romero was never called as a witness by either defendant.

The defendants claim that the trial court's refusal to order disclosure of Romero's complete statement prior to the probable cause hearings deprived them of their right to due process, their right of confrontation, and their right to present a defense pursuant to both the United States and Connecticut constitutions.[16] The applicable standard of review is the same as that utilized in the preceding claim, namely, the test for a *Brady* violation. Pursuant to that test, the defendant must show that the information was suppressed, that it was favorable to the defense, and that it was material. *State v. Shannon*, supra, 212 Conn. 406. Furthermore, even

---

[16] The fifth amendment to the United States constitution provides in relevant part: "No person shall be held to answer for a capital . . . crime, unless on a presentment or indictment of a Grand Jury . . . nor be deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . . No person shall be . . . deprived of life, liberty or property without due process of law . . . . No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury . . . ."

if the defendant is successful in fulfilling all three prongs of the test for a *Brady* violation, the court must then determine whether the violation tainted the defendant's subsequent prosecution and deprived him of the right to a fair trial. *State* v. *McPhail*, supra, 213 Conn. 171. If the latter test is satisfied, then the defendant is entitled to a new probable cause hearing.

In the present case, the defense does not undertake the proper analysis. Doing so now, we conclude that the evidence was suppressed in part prior to the probable cause hearings, but that the information later disclosed was neither favorable nor material to the defense.[17] Additionally, Caraballo had testified at both the probable cause hearings and at trial, and had refuted that he knew an individual named Passetta or an individual fitting Romero's description of Passetta. Furthermore, the full disclosure of Romero's statement occurred well before trial, as is evident through the trial transcripts. Thus, the defendants' claim that the lack of full disclosure of this statement deprived them of their rights of due process, confrontation and to prepare a defense is groundless. Evidentiary rulings were made regarding this statement at trial, to which the defense offered no objections. Indeed, the trial court suggested that the defense call Romero as its own witness later in the trial, which the defense declined to do. We conclude that, pursuant to the *McPhail* test, the defendants are not entitled to either a new probable cause hearing or a new trial.

## B

### Photographic Identification

The defendants next claim that the trial court improperly deprived them of their right to due process when

---

[17] The information, later disclosed to the defense, was that Passetta, now deceased, had told Romero that Caraballo had told her that he was involved in the murders of Alvarado and Bermudez. This information neither exculpated nor incriminated either defendant.

it refused to suppress the photographic identification of Diaz-Marrero by Rodriguez. The defendants also claim that the identification procedure was unnecessarily suggestive and totally unreliable. We disagree.

The following additional facts are relevant to our resolution of this issue. According to the testimony of Lieutenant Ardo Rossi of the Rocky Hill police department, Rodriguez arrived uninvited at the police station on October 25, 1994. She was accompanied by her son, Domingo Alvarado, who acted as his mother's interpreter.[18] She asked to see a photograph of the person the police were going to arrest for the murder of her son. Rossi retrieved a photograph of Diaz-Marrero and showed it to Rodriguez. He described her reaction as follows: "[S]he kind of pulled it to her, stepped back. There . . . was an obvious change in her when she saw that picture." Specifically, Rodriguez recognized Diaz-Marrero as the individual who had come to her house with Ortiz on the night of the murders, looking for her son. The defense moved to suppress the identification as overly suggestive and unreliable. The trial court denied this motion, finding "no suggestibility that was unreasonable or untoward or unnecessary on the part of the police, given the police's state of mind at the time, remembering that the police did not invite Ms. Rodriguez down to the police station. She came there without an appointment, for the express purpose of requesting a picture of the person for whom the warrant had been issued. And, secondly, the court finds that even if that identification procedure . . . then were to have been suggestive in either unnecessary or other fashion, the overall identification, on the totality of the circumstances . . . the court finds reliable."

The standard by which we review this claim is well settled. "[W]e will reverse the trial court's ruling [on

---

[18] Domingo Alvarado died of natural causes prior to trial.

evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 155, 665 A.2d 63 (1995).

"In determining whether identification procedures violate a defendant's due process rights, [t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable. . . . Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect." (Citations omitted; internal quotation marks omitted.)

*State* v. *Austin*, 244 Conn. 226, 246–47, 710 A.2d 732 (1998).

We turn first to the question of whether the procedures used in Rodriguez' identification were unnecessarily suggestive. This court previously has declined to find that a single photograph identification procedure is overly suggestive per se. *State* v. *Ramsundar*, 204 Conn. 4, 10, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). In *Ramsundar*, we moved beyond the trial court's finding that a single photograph identification procedure was unnecessarily suggestive to "whether, based on an examination of the 'totality of the circumstances,' the identifications were nevertheless reliable." Id. We concluded that the identifications were reliable, noting that "we examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related factfinding of the trial court . . . ." (Citation omitted; internal quotation marks omitted.) Id., 12.

In the present case, the trial court found that there was "no unreasonable or unnecessary suggestibility on the part of the police in giving the sole picture to . . . Rodriguez. . . . [T]he police had no idea, in any way, shape, or form that . . . Ms. Rodriguez had been visited the evening of the kidnapping of her son by . . . Ortiz and a person whom she later identified as . . . Diaz-Marrero." The trial court concluded that "[t]he police did little more than respond to a citizen's request, the mother of a victim's request, to see a picture of the fellow they were going to bring back from Puerto Rico to face the charge of murder of her son." We agree with the trial court. There is evidence in the record that Rodriguez' identification at the station house occurred on October 25, 1994, unsolicited by the police. Accordingly, we conclude that the trial court properly found that the identification procedure was not unnecessarily suggestive.

Even if we were to assume that the identification procedure was overly suggestive, the defendants would have had to satisfy the second prong of the test: whether the identification was reliable under the totality of the circumstances. We conclude that it was. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). "The factors relevant to determining the reliability of an identification include, but are not limited to, the following: the opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of her prior description of the criminal; the level of certainty demonstrated at the identification; the time between the crime and the identification . . . and the degree of contact or number of confrontations the witness had with the defendant prior to trial." (Citations omitted.) *State* v. *Milner*, 206 Conn. 512, 527, 539 A.2d 80 (1988).

In the present case, Rodriguez had ample opportunity to observe Diaz-Marrero both times that he came to her home looking for her son. The trial court stated: "There was plenty of light and there was sufficient closeness, and there's no indication that Ms. Rodriguez' eyesight is other than fully normal. . . . Ms. Rodriguez' level of certainty was . . . high . . . and I weigh [that] factor . . . more heavily than any other factor in this analysis." The three month time period that had elapsed between the crime and the identification was deemed to be "long . . . [but] any negative aspect of both the degree of attention and the time between the crime and the confrontation is far outweighed by the opportunity to view and the level of certainty of the witness' identification . . . ."[19]

---

[19] We note that we have held, on prior occasions, that longer time periods between an incident and an identification are not sufficient to render an identification unreliable. "In *State* v. *Parker*, 197 Conn. 595, 600, 500 A.2d 551 (1985), we stated that, 'the ten month period between the identification and [the victim's viewing of her assailant] was [not] so long as to render

Finally, we are persuaded that any weaknesses the defendants may have found inherent to Rodriguez' identification testimony could have been explored at length during trial. "Any uncertainty on the witness' part goes toward the weight of the evidence rather than the admissibility. . . . The weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury. . . . The exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, supra, 235 Conn. 159–60.

We conclude that the trial court reasonably could have found from the totality of the circumstances that Rodriguez' identification of Diaz-Marrero on October 25, 1994, was not unnecessarily suggestive and was sufficiently reliable to be admissible. Accordingly, we conclude that the trial court properly denied the defendants' motion to suppress.

C

In Camera Inspection of Psychiatric Records

The defendants claim that the trial court improperly denied their motion for an in camera inspection of

___

her identification unreliable.' See also *State* v. *Liptak*, 21 Conn. App. 248, 253, 573 A.2d 323, cert. denied, 215 Conn. 809, 576 A.2d 540 (1990) (in-court identification occurring eight months after crime is not impermissibly distant in time)." *State* v. *Figueroa*, supra, 235 Conn. 158–59.

Rodriguez' psychiatric records, arguing that the trial court improperly held the defendants to a higher standard than that required for a preliminary showing that an in camera inspection was warranted. We find this argument groundless.

"It is well settled in this state that before a criminal defendant may obtain an in camera inspection of a witness' confidential records for purposes of impeachment, he or she must first demonstrate that there is a reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. *State* v. *Esposito*, 192 Conn. 166, 179, 471 A.2d 949 (1984) . . . . Where, as here, the witness' records are sought for the purpose of obtaining evidence of a mental condition bearing on the witness' testimonial capacity, we require the defendant, who is afforded an opportunity to voir dire persons with knowledge of the contents of the records sought, to adduce a factual basis from which the trial court may conclude that there is a reasonable ground to believe that the records will reveal that at any pertinent time [the witness' mental problem] affected his testimonial capacity to a sufficient degree to warrant further inquiry. *State* v. *D'Ambrosio*, [212 Conn. 50, 59, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990)] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 522–23, 673 A.2d 1117 (1996). "Our assessment of the trial court's decision to restrict the defendant's access to the witness' confidential records must, however, take into account the recognized principle that such a restriction implicates the defendant's constitutional right to impeach and discredit state's witnesses. . . . Thus, in reviewing the defendant's claim, we must also determine whether the trial court's rulings denied him a fair opportunity to elicit testimony about how

the records he sought might shed light on a relationship between [Rodriguez] and her capacity to testify truthfully." (Citations omitted; internal quotation marks omitted.) Id., 532.

In the present case, the defense did not present any witnesses, other than Rodriguez herself, to make the required preliminary showing that her mental condition had affected her testimonial capacity. Rodriguez did testify that she had experienced difficulty concentrating after her son's death; that she had sought treatment "for nerves" at Hartford Hospital; that she "sometimes" took medication for her nerves; and that her memory was not confused or unclear due to her treatment or condition. The trial court, while acknowledging that Rodriguez "is in many ways an unusual witness but nonetheless a witness that was quite convincing" and that "in a capital case . . . I would tend to bend over backwards to make sure that the defense has every possible chance to get in what evidence it wishes," concluded that "[t]here is not a remotely close showing of anything preliminary in this regard." Indeed, the trial court invited the defense to pursue this inquiry further, assuring that it would consider evidence regarding Rodriguez' testimonial capacity if offered, but the defense did not offer any such evidence. "We have observed that 'a defendant's right [of cross-examination] is not infringed if the defendant fails to pursue a line of inquiry open to him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was made.' . . . *State* v. *Mastropetre*, [175 Conn. 512, 522, 400 A.2d 276 (1978)]." *State* v. *Bruno*, supra, 236 Conn. 533. Having failed to avail themselves of the court's offer of an opportunity to conduct a proper inquiry, the defendants cannot now claim deprivation.

## D

## Double Jeopardy

The defendants next argue that the trial court improperly rendered judgments of conviction on three separate counts of conspiracy and sentenced them separately for each conviction. They argue, and the state agrees, that this is a violation of their constitutional rights against double jeopardy. The defendants were charged with and convicted of three separate conspiracy counts: murder, kidnapping in the first degree, and robbery in the first degree.The same basic factual allegations underlie each of the charged conspiracies.

"Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation, only the single penalty prescribed by the statute can be imposed. *Braverman* v. *United States*, 317 U.S. 49, 53–54, 63 S. Ct. 99, 87 L. Ed. 23 (1942); see also *State* v. *Hayes*, 127 Conn. 543, 18 A.2d 895 (1941); *State* v. *Kitt*, 8 Conn. App. 478, 489–90, 513 A.2d 731, cert. denied, 202 Conn. 801, 518 A.2d 648 (1986)." (Internal quotation marks omitted.) *State* v. *Howard*, 221 Conn. 447, 462, 604 A.2d 1294 (1992).

Accordingly, the judgments as to the three conspiracy counts must be set aside and remanded to the trial court with direction to combine the defendants' three conspiracy convictions and to vacate the sentences for two of the conspiracy convictions. See id., 460–63; *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990),

cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

## E

### Jury Instruction Regarding Credibility

The defendants also claim that the trial court improperly failed to provide the jury with a requested instruction regarding the credibility of Caraballo.[20] The defendants argue that the trial court's failure to provide this specific instruction deprived them of their right to a fair trial.

While the trial court declined to give the jury the defendants' proposed instruction, it did deliver the standard and accepted instructions regarding the assessment of witness credibility generally, including any possible bias or motive to testify falsely and any interest in the outcome.

It is a well established principle that a defendant is "entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. See *State* v. *Griffin*, 175 Conn. 155, 163, 397 A.2d 89 (1978); 4 Wharton, Criminal Procedure (12th Ed.) § 540; see also *Mack* v. *Perzanowski*, 172 Conn. 310, 312, 374 A.2d 236 (1977); *Berniere* v. *Kripps*, 157 Conn. 356, 360, 254 A.2d 496 (1969). The charge must be correct in the law, adapted to the issues and sufficient to guide the jury. See *State* v. *Annunziato*, 169 Conn. 517,

---

[20] The defendants' request to charge provided in relevant part: "In regard to the testimony of Ramon Caraballo; if you find that his testimony and statement to police was motivated by a desire to cover up or minimize his own involvement or participation in this incident and to avoid arrest you should consider his testimony with more care and caution than other witnesses. A witness who has gained favorable treatment from the authorities and who may hope to gain further favorable treatment may have good reasons to testify falsely because he wants to strike a good bargain with the prosecution or [curry] favor with the authorities. . . . In this case the desire of a witness to avoid prosecution in a Capital Murder case may be an especially strong motivation to testify falsely."

531, 363 A.2d 1011 (1975); *State* v. *DaVila*, 150 Conn. 1, 5, 183 A.2d 852 (1962). The primary purpose of the charge to the jury is to assist them in applying the law correctly to the facts which they find to be established. *Velardi* v. *Selwitz*, 165 Conn. 635, 637, 345 A.2d 527 (1974). On review, we examine the charge to see if it fairly presents the case to the jury in such a way that injustice was not done under the law to the legal rights of the defendant. See *State* v. *Harris*, 172 Conn. 223, 226, 374 A.2d 203 (1977); *Farlow* v. *Connecticut Co.*, 147 Conn. 644, 648, 166 A.2d 202 (1960)." (Internal quotation marks omitted.) *State* v. *Cooper*, 182 Conn. 207, 210–11, 438 A.2d 418 (1980).

Generally, a defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. Id., 212 n.5. There are, however, two exceptions to this rule: the complaining witness exception and the accomplice exception. Neither exception applies to the present case.

The complaining witness exception, set forth in *State* v. *Cooper*, supra, 182 Conn. 211–12, provides that when a "complaining witness could himself have been subject to prosecution depending only upon the veracity of his account of [the] particular criminal transaction, the court should . . . [instruct] the jury in substantial compliance with the defendant's request to charge to determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused. We emphasize . . . there must be evidence . . . to support the defendant's assertion that the complaining witness was the culpable party." In the present case, Caraballo was not a complaining witness, nor was he subject to prosecution depending upon the veracity

of his testimony.[21] Accordingly, the defendants were not entitled to a specific instruction pursuant to the complaining witness exception to the general rule regarding witness credibility.

In *State* v. *Shindell*, 195 Conn. 128, 486 A.2d 637 (1985), we articulated the rule regarding instructions involving accomplice witnesses. We held that " 'where it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if he assisted or aided or abetted in the commission, of the offense with which the defendant is charged.' . . . *State* v. *Ferrara*, 176 Conn. 508, 512, 408 A.2d 265 (1979); *State* v. *Colton*, 174 Conn. 135, 140, 384 A.2d 343 (1977)." (Emphasis in original.) *State* v. *Shindell*, supra, 142. In the present case, the trial court determined that there was insufficient evidence to show that Caraballo was an accomplice. Caraballo was not charged with the crimes for which the defendants were tried and there was no evidence presented that directly linked Caraballo to the crimes as an accomplice. The jury did hear evidence regarding Caraballo's presence in the van on the night of the murders and also was privy to the defendants' cross-examination of Caraballo. Pursuant to the trial court's general instruction regarding witness credibility, the jury was on notice that it had the duty to consider Caraballo's testimony— like any other witness' testimony—with consideration of "the probability or improbability of [his] testimony . . . [as well as] any interest, bias, prejudice, or sympathy or lack of interest, bias, prejudice, or sympathy which [he] may apparently have for or against the state

---

[21] As the state points out, the defendants' complaint that there are no complaining witnesses in murder cases is irrelevant. While a *Cooper* charge may not be available to a defendant in a murder trial, an instruction premised upon accomplice theory—a *Ferrara/Shindell* instruction—certainly may be appropriate. See *State* v. *Ferrara*, 176 Conn. 508, 408 A.2d 265 (1979); *State* v. *Shindell*, 195 Conn. 128, 486 A.2d 637 (1985).

or for or against the accused, or interest in the outcome of the trial." We deem this instruction sufficient.

Because Caraballo did not fit into either categorical exception to this generalized credibility instruction, the trial court correctly declined to give the defendants' requested instruction.

## II

## CLAIMS OF ORTIZ

We now consider the following additional claims raised by Ortiz: (1) the trial court improperly refused to allow him to present evidence of a third party's culpability; (2) he was denied his right to a speedy trial; (3) the trial court improperly refused to grant him a new trial on the basis that the evidence presented was clearly insufficient to warrant a jury verdict of guilty; and (4) the jury's verdict was tainted as a result of the trial court's improper instruction regarding the presumption of innocence and reasonable doubt. We reject each of these claims.

## A

## Third Party Culpability

Ortiz argues that the trial court improperly precluded third party culpability evidence, thereby depriving him of a fair trial. Specifically, Ortiz argues that the trial court improperly excluded evidence that certain drug dealers, Jorge Pagan and Juan Pagan, had hired and ordered hitmen to carry out Alvarado's murder, and that Caraballo and Diaz-Marrero were the hired hitmen. Upon Ortiz' offer of proof regarding the evidence pertaining to the Pagans, the court determined that there was not "anything remotely approaching the required more than a mere possibility of third party culpability," and ruled that the evidence was irrelevant as to third

party culpability and was, therefore, inadmissible. We agree.

"Both this state and other jurisdictions have recognized that a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party to the crime with which the defendant is charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . . *State* v. *Echols*, 203 Conn. 385, 392, 524 A.2d 1143 (1987); *State* v. *Milner*, [supra, 206 Conn. 517]. The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. *State* v. *Echols*, supra, 393; *State* v. *Giguere*, 184 Conn. 400, 405–406, 439 A.2d 1040 (1981). No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. *Pope Foundation, Inc.* v. *New York, N.H. & H. R. Co.*, 106 Conn. 423, 435–36, 138 A. 444 (1927); *State* v. *Towles*, 155 Conn. 516, 523, 235 A.2d 639 (1967). The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. *State* v. *Echols*, [supra, 393]." (Internal quotation marks omitted.) *State* v. *Boles*, 223 Conn. 535, 548–49, 613 A.2d 770 (1992).

The fatal flaw in Ortiz' claim is that the proffered evidence neither directly connected the Pagans with the commission of the crime of which Ortiz was accused, nor indicated that the Pagans, *instead of Ortiz,*

had committed the crime.[22] While the evidence in question could suggest a motive and, conceivably, a means by which the Pagans could have ordered the murder of Alvarado, it did not establish the necessary direct connection between the Pagans and the crime. As we indicated in *State* v. *Boles,* supra, 223 Conn. 549–50, "[i]t would be sheer speculation to draw from the evidence presented an inference that [the Pagans, and not Ortiz] had killed the victim[s]. . . . Unless that direct connection exists it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." (Citation omitted; internal quotation marks omitted.) After a careful review of the record, we conclude that the trial court did not abuse its discretion in finding that the proffered evidence did not meet the required standard for third party culpability evidence and in rendering the evidence inadmissible.

## B

### Right to a Speedy Trial

Ortiz also argues that he was denied his constitutional and statutory right to a speedy trial as a result of the trial court consolidating his case with that of Diaz-

---

[22] In his proffer of evidence, Ortiz offered an affidavit from David Aldridge, an agent from the Drug Enforcement Administration, which set forth facts as to why the agency believed that the Pagans were suspects in the murders of Alvarado and Bermudez. These facts included: (1) someone had stolen two parcels of cocaine from the Pagan family; the Pagans knew who had stolen them and these people were in trouble with the Pagans; (2) the Pagans routinely reserved and paid for rooms at the Motel 6 located on the Silas Deane Highway in Wethersfield; (3) the bodies of the victims were found midway between the Motel 6 and the Century Hills Apartment where Juan Pagan lived; (4) Alvarado was identified as a cocaine distributor for the Pagans; (5) Caguas, Puerto Rico, is a small community where Juan Pagan was born and raised and Diaz-Marrero is also from Caguas; (6) the night before the murders, Jorge Pagan's cellular telephone records reveal that a call was placed from that telephone to the Motel 6; (7) approximately ten minutes after the bodies were discovered, a call was placed to Jorge Pagan's home.

Marrero. After consolidating the cases, the trial court refused to start jury selection because one of Diaz-Marrero's public defenders was unavailable.[23] Ortiz argues that his rights, pursuant to the sixth amendment of the United States constitution[24] and General Statutes § 54-82m (2),[25] were denied by virtue of the trial court's decision.

Both Ortiz and the state agree that the thirty day time period in which his trial was to begin, pursuant to § 54-82m (2), commenced on September 19, 1996. The state argues, however, that the trial court expressly relied upon Practice Book § 956C (d), now § 43-40 (4),[26] for its proper finding of good cause for delay.[27] The trial court ordered that jury selection begin on October 15, 1996, and that evidence begin on January 6, 1997, specifically excluding from Ortiz' thirty day speedy trial

[23] Barry Butler, one of Diaz-Marrero's attorneys, was scheduled to begin the penalty phase of another capital case on September 16, 1996.

[24] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

[25] General Statutes § 54-82m (2) provides in relevant part: "[I]f a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. . . ."

[26] Practice Book § 43-40 provides in relevant part: "The following periods of time shall be excluded in computing the time within which the trial of a defendant charged by information with a criminal offense must commence . . .

"(4) A reasonable period of delay when the defendant has been joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted. . . ."

[27] Practice Book § 43-41, previously § 956D, provides in relevant part: "If the defendant is not brought to trial within the applicable time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice . . . . For the purpose of this section, good cause consists of any one of the reasons for delay set forth in Section 43-40. When good cause for delay exists, the trial shall commence as soon as is reasonably possible. . . ."

period the period of time from September 5, 1996, the date of this ruling, to October 15, 1996. Ortiz now claims that this time period is not excludable because § 54-82m (2) does not provide for suspension of the thirty day time period under any circumstances and necessarily takes precedence over a rule of practice.

This court previously has held that "neither the statute nor the rules of practice precludes the exercise of" the court's power "to suspend the running of [the thirty day] period for a reasonable time . . . ." *State* v. *Brown*, 242 Conn. 389, 405, 699 A.2d 943 (1997). Ortiz argues that our holding in *Brown* is narrowly limited to a situation in which the defendant's own counsel is unavailable for trial, not a situation such as we have here: the unavailability of the codefendant's counsel. The state counters that the trial court's inherent power to find good cause is not so limited. We agree with the state.

Our holding in *Brown* is not as narrowly circumscribed as Ortiz suggests. In *State* v. *Brown*, supra, 242 Conn. 405, we pointed out that "unworkable results" are to be avoided in our interpretations. "Indeed, a literal interpretation of the language of the statute and the rules of practice would lead to other unworkable results. Reading the language to permit *no* exceptions once the thirty day speedy trial motion was filed would mean, for example, that even if the defendant's attorney were to become unavailable because of illness or another unavoidable circumstance, or even if the defendant fled the jurisdiction, the case would have to be dismissed. Despite the categorical nature of the language of the statute and the rules of practice, we conclude that it would not require such a result. Thus, if a literal application of the language of the statute would generate a clash between the defendant's rights to a speedy trial and to adequate representation, the literal application must yield to the power of the court to

make a reasonable accommodation between those two rights, as did the trial court in this case." (Emphasis in original.) Id., 406.

We conclude that the trial court properly determined, as provided by § 43-40 (4), that there existed good cause for "[a] reasonable period of delay when the defendant has been joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Ortiz was not prejudiced in any way by this decision. Furthermore, there is no evidence on the record to suggest that even if jury selection had commenced on September 15, 1996, the trial would have started any earlier than January 6, 1997. Ortiz' claim that he was deprived of his statutory right to a speedy trial is, therefore, groundless.

We also conclude that Ortiz' claim that his constitutional right to a speedy trial was violated is equally meritless. "The Supreme Court of the United States and this court have identified four factors which form the matrix of the defendant's constitutional right to a speedy adjudication: [l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 118, 588 A.2d 145 (1991). We consider each of these factors in turn.

Both parties concede that Ortiz was incarcerated for fourteen months before his trial commenced. This is a long enough period of time to "trigger further inquiry." *State* v. *Brown*, 172 Conn. 531, 536, 375 A.2d 1024, cert. denied, 434 U.S. 847, 98 S. Ct. 153, 54 L. Ed. 2d 114 (1977) (nine month delay triggers further inquiry, but when considered in light of other three factors, defendant was not deprived of constitutional right to speedy trial).

Our courts have not held that any particular length of delay is presumptively prejudicial, but have stated that an extensive delay warrants an inquiry into the other factors of *Barker*. See, e.g., *State* v. *Gasparro*, 194 Conn. 96, 100, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985) (three and one-half years); *State* v. *Davis*, 192 Conn. 739, 740–41, 474 A.2d 776 (1984) (twenty-six months); *State* v. *Cleary*, 3 Conn. App. 349, 350–51, 488 A.2d 831 (1985) (thirty-eight months). "There is no constitutional basis for holding that the speedy trial right can be quantified into a specific number of days or months. *Barker* v. *Wingo*, supra, 407 U.S. 523." (Internal quotation marks omitted.) *State* v. *Martin*, 56 Conn. App. 98, 103, 741 A.2d 337 (1999), cert. denied, 252 Conn. 926, 746 A.2d 790 (2000).

Turning to the reasons for the delay in the present case, we conclude that Ortiz' own conduct led to the fourteen months of incarceration. Specifically, Ortiz was arrested in New Jersey on August 31, 1995, and had to be extradited to Connecticut, where he was arrested on November 19, 1995. This delay, therefore, is only attributable to his action, not to that of the state. Indeed, the only delay attributable to the state is the delay caused by the unavailability of Diaz-Marrero's counsel, which was deemed good cause by the trial court.

The state concedes that Ortiz requested no continuances upon his return to Connecticut, and did invoke his statutory right to a speedy trial at the earliest opportunity. Accordingly, the third factor of the required test is adequately met.

The fourth and final factor is the prejudice caused to Ortiz as a result of the delay. "Three interests have been identified as those which the right to a speedy trial was designed to protect and which therefore may

be prejudiced by the deprivation of that right. . . . (i) [T]o prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (Citation omitted; internal quotation marks omitted.) *State* v. *Mooney*, supra, 218 Conn. 121. Ortiz argues that he was caused frustration and anxiety by his pretrial incarceration, heightened by the fact that he "woke up in jail each day with the threat of the death penalty hanging over his head." As the state argues, there is nothing in the record to distinguish his emotional strain from that experienced by other capital defendants. Of even greater significance, however, is Ortiz' own identification of the prejudice he suffered as a result of the delay: "There is no specific prejudice other than that he's been in jail for an extra month now and the trial has not begun. There's no—I can't point to any witnesses that we've lost or any other factors." As this proffer does not amount to a showing of substantial prejudice in any way, we conclude that Ortiz' constitutional right to a speedy trial has not been violated. See *State* v. *Mooney*, supra, 125.

## C
### Manifest Weight of Evidence

Ortiz also argues that the jury's finding of guilt is a miscarriage of justice, reached against the manifest weight of the evidence, and that the trial court improperly refused to grant him a new trial. Using *State* v. *Hammond*, 221 Conn. 264, 267, 604 A.2d 793 (1992), for his support, Ortiz argues that "the exculpatory evidence he offered in his defense was so strong that the trial court improperly refused to rule that the verdict was contrary to the manifest weight of the evidence."

In *Hammond*, we determined that "[a]ppellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [W]e now conclude that the appropriate standard of review is abuse of discretion." (Citations omitted.) Id., 269–70. Accordingly, we employ this standard in the present case.

Ortiz claims that Caraballo's testimony and the physical evidence related thereto are in direct conflict and, consequently, lead to an impossible conclusion of Ortiz' guilt. We disagree.

Ortiz argues that Caraballo's testimony is filled with a multitude of contradictions, including: disparate testimony regarding the duration of Caraballo's stay in the hospital after his gunshot wound; conflicts regarding Caraballo's acquaintance with Ortiz and his wife; vague and conflicting descriptions of the van driver; the testimony that there was one gunman, yet two guns were discovered; and evidence suggesting that it was physically impossible for Caraballo's wound to have occurred as he described. None of these alleged inconsistencies, however, exculpates Ortiz.

For example, the state argues that even if it was physically impossible for Caraballo to have been shot exactly as he testified, the jury's verdict regarding Ortiz' guilt did not require or suggest a conclusion as to how and when Caraballo was shot. Unlike in *State* v. *Hammond*, supra, 221 Conn. 264, the trial court here was not confronted with evidence that precluded the possibility of the verdict as reached. In *Hammond*, evidence was presented that the blood typing and DNA tests performed on samples taken from the victim's clothing made it a physical impossibility that the defendant was the man who had sexually assaulted the victim. Id., 279.

"If indeed the state's theory was based on physically impossible facts and conclusions . . . then the defendant's motion for a new trial should have been granted." (Citation omitted; internal quotation marks omitted.) Id., 286. Here, the jury did not have to draw any conclusions related to Caraballo's gunshot wound in order to find Ortiz guilty. "Nothing in our criminal jurisprudence mandates that a jury accept a defendant's version of events or the reasonable inferences that flow therefrom. The jury is free to juxtapose conflicting versions of events and to determine which is the more credible. . . . Should it determine, as it did here, that the state has proven beyond a reasonable doubt facts constituting the elements of the crimes charged, its responsibility is to return verdicts of guilty. We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citations omitted; internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 278, 623 A.2d 42 (1993). Accordingly, we conclude that the trial court did not abuse its discretion in its refusal to grant Ortiz a new trial.

D

Presumption of Innocence and Reasonable Doubt

Ortiz' penultimate argument is that the trial court misled the jury on the presumption of innocence and reasonable doubt, thereby requiring a reversal of the jury's verdict. Ortiz argues that the trial court's instruction that "the law is made to protect society, so that if and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that an accused person is guilty of a crime charged, then it is the sworn duty of the jury to enforce

the law and to render a verdict of guilty" is so egregious that it "eviscerates the fundamental protections underlying the presumption of innocence and the reasonable doubt standard, requiring reversal of [his] convictions." For this proposition, Ortiz relies on *United States* v. *Doyle*, 130 F.3d 523, 533–39 (2d Cir. 1997), wherein the Second Circuit Court of Appeals concluded that the instructional language, "those rules of law are designed to protect the innocent and not the guilty," violated the defendant's constitutional rights. "We reaffirm the proposition that the presumption of innocence and the beyond-a-reasonable-doubt standard apply to all criminal defendants without regard to their actual guilt or innocence. This principle is woven throughout the cloth of American jurisprudence. . . . This notion necessarily encompasses an implicit understanding that the two rules of law must apply to all defendants, regardless of their actual guilt or innocence, if the purpose of the rules is to be achieved." (Citations omitted; internal quotation marks omitted.) Id., 538.

This court recently has concluded that the Second Circuit's holding in *Doyle* is sound, limited to the finding that "[b]ecause the guilty as well as the innocent are entitled to the protections afforded by the presumption of innocence and the reasonable doubt standard, the challenged portion of the charge [which is identical to that involved in *Doyle*], when viewed in isolation, gives rise to a danger of juror misunderstanding." *State* v. *Schiappa*, 248 Conn. 132, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). *Schiappa* concluded that a *Doyle* instruction does not rise to the level of a constitutional violation; however, we did, "in the exercise of our supervisory authority over the administration of justice . . . direct our trial courts to refrain from the use of that language in the future." Id.

In the present case, the trial court adhered to our ruling in *Schiappa* and did not use the prohibited language. We fail to see how the trial court's use of the phrase "made to protect society" suggests, as the instruction did in *Doyle* and *Schiappa*, that the guilty are not to be protected by the same laws that protect the innocent. There is no reversible error inherent to the trial court's instruction. Thus, Ortiz' claim must fail.

## III

### CLAIMS OF DIAZ-MARRERO

We next consider the two additional claims that Diaz-Marrero makes on appeal. First, he contends that the trial court improperly consolidated the cases against him and Ortiz. Finally, he claims that the trial court incorrectly instructed the jury regarding the two witness rule. We disagree with Diaz-Marrero regarding both of these claims.

### A

#### Joinder

Diaz-Marrero claims that the trial court improperly granted the state's motion for joinder and improperly overruled his objection to such joinder. The following additional facts are relevant to this claim. By motion dated August 19, 1996, the state moved for joinder of the trials of the two defendants. Diaz-Marrero objected, alleging that "substantial injustice will result if [the two defendants] are tried together. Evidence admissible against [Ortiz] will not be admissible against [Diaz-Marrero]. Additionally, [Diaz-Marrero] asserts that a separate trial will be required to insure that the [rights] of the accused are not prejudiced." The trial court granted the state's motion for joinder, determining that "I do not find any unfairness likely to result from the consolidation of the two cases. . . . I do not accept the possible differing treatment on cross-examination of a state's

witness by the two defense counsel as sufficient to justify the denial of the consolidation motion."

On appeal, Diaz-Marrero claims that the trial court improperly granted the state's motion for consolidation and improperly denied his objection. Although his argument is vague, Diaz-Marrero asserts that the consolidation "resulted in manifest prejudice or substantial injustice to one or both defendants requiring a new trial for both defendants."[28] We disagree with Diaz-Marrero and conclude that the trial court did not abuse its discretion in conducting a joint trial.

"[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . Ordinarily justice is better subserved where parties are tried together. . . . Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 620, 737 A.2d 404 (1999).

"The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded. *State* v. *White*, [229 Conn. 125, 158, 640 A.2d 572 (1994)]. [W]e will reverse a trial court's ruling on joinder only where the trial court commits an abuse of discretion that results in manifest prejudice to one or

---

[28] It is important to note that Ortiz has raised no claim on appeal regarding the propriety of consolidation.

more of the defendants. *State* v. *Vinal*, [198 Conn. 644, 649, 504 A.2d 1364 (1986)]." *State* v. *Booth*, supra, 250 Conn. 620.

Pursuant to this standard, we conclude that the trial court did not abuse its discretion in determining that the defendants' defenses were not antagonistic. The test for antagonistic defenses provides: "When . . . the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant, the defenses are sufficiently antagonistic to mandate separate trials. *State* v. *Vinal*, supra, 198 Conn. 652. To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. . . . Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 621.

The defenses that developed at trial were not antagonistic. Unlike *Vinal*, neither of the codefendants here accused the other of the crimes for which he was charged. Diaz-Marrero claims that he had to defend himself against Ortiz. Diaz-Marrero asserts that because he had to attack the credibility of Caraballo and Roman—the witnesses who identified him as the shooter—and Ortiz only had to attack the credibility of Caraballo—who identified Ortiz as the driver—Ortiz was implicitly suggesting that Roman's testimony was credible. Diaz-Marrero also argues that the defendants' defenses were incompatible in that admission into evidence of two postconspiratorial hearsay statements attributed to Ortiz[29] had a detrimental and prejudicial

---

[29] The two statements referred to are Ortiz' alleged comment to Romero that, "If I get arrested I'm not going alone," and his conversation with Aida Bermudez at her sister's wake in which Ortiz revealed details about the killings.

effect upon Diaz-Marrero. Both arguments are without merit.

The defenses of each defendant were not incompatible because the jury reasonably could have accepted the defenses simultaneously. Specifically, the jury could have found that both Roman's and Caraballo's testimony was flawed. The fact that Ortiz attacked the testimony of Caraballo and not the testimony of Roman does not mean that the jury would have found it impossible to accept the testimony of either Caraballo or Roman.

Furthermore, Diaz-Marrero's claim that he was prejudiced by the admission of Ortiz' hearsay is fatally flawed by virtue of the fact that he did not request a limiting instruction regarding this evidence, and he failed to take exception to the admission of the evidence. In *State* v. *Butler*, 207 Conn. 619, 630, 543 A.2d 270 (1988), this court held that where a defendant fails to make a request to charge and does not except to the charge as given or ask for a supplemental charge, we shall not consider such claims on appeal. Even if we were to review this claim, however, it is meritless in that Ortiz' statements did not inculpate Diaz-Marrero, impair his defense in any way, or cause him any prejudice.

Accordingly, Diaz-Marrero has failed to demonstrate that he has suffered any prejudice or injustice as a result of the trial court's consolidation of the two cases. We, therefore, affirm the decision of the trial court.

## B

## Two Witness Rule

Finally, Diaz-Marrero argues that he is entitled to a new trial because the trial court improperly instructed the jury regarding the two witness rule. We disagree with this claim.

The two witness rule is codified at General Statutes § 54-83 and provides that "[n]o person may be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." Diaz-Marrero requested the following jury instruction on February 4, 1997: "Concerning the charge of capital felony, the law requires that no person may be convicted of this crime without the testimony of at least two witnesses, or that which is equivalent thereto. The rule is satisfied if there are two or more witnesses, each testifying to different parts of the same transaction, or to different circumstances concerning the case, tending directly to show the guilt of the accused. The rule is also satisfied if one witness testifies to the principal fact and another to circumstances corroborating it."

Instead of the requested instruction, the trial court charged the jury that: "[T]here is one other rule that applies to the crimes of capital felony, and that's our law that provides that no person may be convicted of any crime punishable by death without the testimony of at least two witnesses or that which is equivalent thereto. It's our law in most criminal cases that a person can be convicted on the testimony of just one person. In a charge of capital felony the state is required to produce more than a single witness. And in this case when the state called approximately forty witnesses in support of its charge, you may well find that they have met their additional evidentiary burden of calling at least two witnesses or that which is equivalent thereto, but that, like all factual issues, is for your determination . . . ."

"First enacted in 1672, § 54-83 has been construed, in this century, to have a dual function. The statute not only imposes an additional evidentiary burden on the state but requires the finder of fact, upon proper instructions, to determine whether the state has met its burden. The defendant therefore has a statutory entitlement to

an instruction informing the jury that, in capital cases, the state has an additional evidentiary burden above and beyond its obligation to prove its case beyond a reasonable doubt. . . . Because the statute allows the state to have recourse to 'equivalent' evidence, the state can satisfy its statutory burden by producing more than one witness to provide circumstantial evidence from which the jury may infer the defendant's guilt." (Citations omitted.) *State* v. *Ross*, 230 Conn. 183, 219, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

In the present case, Diaz-Marrero's requested charge erroneously states the statutory rule. Section 54-83 does not require that there be "two or more witnesses, each testifying to different circumstances concerning the case," as his requested charge asserts. Accordingly, we conclude that the trial court properly refused to give the requested charge to the jury and properly instructed the jury pursuant to the correct meaning of the statute.

The judgments are reversed in part and the cases are remanded to the trial court with direction to combine the defendants' three conspiracy convictions and to vacate the sentences for two of the conspiracy convictions; the judgments are affirmed in all other respects.

In this opinion the other justices concurred.