******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSEPH WALKER
(AC 38916)

Alvord, Sheldon and Mullins, Js.

Argued October 5,—officially released December 20, 2016

(Appeal from Superior Court, judicial district of Waterbury, Cremins, J.)

*Katherine C. Essington*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy L. Sedensky* and *Terence D. Mariani*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Joseph Walker, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[1] On appeal, the defendant claims (1) there was insufficient evidence to support his conviction for robbery in the first degree and conspiracy to commit robbery in the first degree; (2) the court improperly instructed the jury on the elements of conspiracy to commit robbery in the first degree; and (3) the court committed plain error by failing to instruct the jury on accomplice or informant testimony. We affirm in part and reverse in part the judgment of the trial court.

The following facts reasonably could have been found by the jury. On May 10, 2012, the defendant arranged to purchase $6150 worth of cocaine from the victim, David Caban. Caban lived at 127 Proctor Street in Waterbury with his girlfriend, Lourdes Santana, and Santana's mother. On May 12, 2012, at approximately 9 p.m., the victim was inside his home with his close friend and cousin, Angelo Caban (Angelo). Santana and her mother also were present in the home. Another friend, Anthony Jackson, was sitting in a chair on the front porch of the home.

At approximately 9:30 p.m., the defendant, accompanied by his close friend, Solomon Taylor, drove in a white Mitsubishi Gallant (vehicle), which was owned by Taylor's girlfriend, Alexia Bates, to the home of the victim to purchase the cocaine. The defendant parked the vehicle directly in front of the house so that the passenger's side of the vehicle was facing it.

The victim left the house and approached the vehicle. The victim momentarily leaned into the rear passenger's side of the vehicle, and then returned to the inside of his house, where he went into his bedroom. When the victim walked by Angelo as he again exited the house to return to the vehicle, he stated: "Cuz, stand right here and make sure . . . I'm good." Angelo proceeded to stand on the steps outside of the house, where he talked with Jackson. As the victim approached the vehicle, he was carrying the crack cocaine in a brown paper bag, which was tucked in his waistband.

The victim again leaned into the rear passenger's side of the vehicle, with his feet hanging out. Shortly thereafter, a struggle began between the victim and the occupants of the vehicle. One of the occupants of the vehicle had a revolver, and the victim was attempting

to hold his arm in an effort to avoid being shot; that occupant then fired a shot through the roof of the vehicle. After hearing the shot, both Angelo and Jackson ran toward the vehicle, but, by the time they reached it, more shots had been fired, and the victim had been hit twice, once in the arm and once in the head. As a result of his injuries, the victim was slumped over with his body only partially inside the vehicle.[2]

Jackson then began striking the front passenger's side window of the vehicle with a child's Razor scooter that he found near the house. After breaking the window, Jackson fought with the man in the passenger's seat. Meanwhile, Angelo tried to pull the victim out of the vehicle, but, as he did so, more shots were fired. Jackson then retreated from the immediate area by jumping over a fence and hiding behind a building. Angelo then went to the driver's side of the vehicle, where he encountered the defendant, who was pointing a revolver directly at him. The barrel of the revolver was within arm's reach of Angelo's face. Taylor then yelled to the defendant to "forget it," and both men reentered the vehicle and drove away with the rear passenger's side door open and the victim only partially inside the vehicle.

Angelo retrieved his car keys from inside the house, and he and Santana drove after the defendant and Taylor. Within approximately one quarter of a mile, Angelo and Santana saw the victim's body in the street. Angelo stopped the car, and Santana called for help. Santana also dialed the victim's cell phone number. When someone answered her call, she began yelling into the phone, and the person on the other end hung up. The victim was transported to Saint Mary's Hospital, where he died from his wounds. The victim had approximately $40 in cash on his person when he was transported.

Meanwhile, the defendant drove to the home of Taylor's girlfriend, Alexia Bates. Upon his arrival, the defendant went upstairs into Bates' apartment and proceeded to go into the bathroom to treat a gunshot wound to his hand, which he had suffered during the struggle with the victim. Taylor, who appeared frantic as he was pacing back and forth, encountered Bates and her roommate in the roommate's bedroom. Taylor then asked Bates to go into her bedroom, which she did. Bates could see blood on Taylor's boxer shorts, which later DNA analysis determined belonged to the victim. While they were in Bates' bedroom, a red slide-style cell phone in Taylor's possession began to ring. When Taylor answered the phone, Bates heard a woman screaming on the other end. Taylor quickly hung up the phone; he did not appear to know who was calling him.

Taylor then ordered Bates to go to her vehicle to retrieve the revolver. Bates went to the vehicle, where she saw many different sized pieces of crack cocaine mixed with blood and glass on the floor. She also saw

blood on the door, on the front seat, in the middle console, on the dashboard where the airbag is contained, and in the back passenger's seat. She saw broken glass on the floor and on the front seat, and bullet holes in the roof. Bates also discovered the revolver, which she then brought upstairs to Taylor, who put it in his waistband. Taylor then told Bates to gather cleaning supplies to clean the vehicle; Bates grabbed a bucket that she filled with water and "cleaning stuff," "sponges, rags . . . [and] Clorox spray." She also used a bottle of Febreze that already was in the vehicle.

As Bates and Taylor cleaned the vehicle, Taylor told her that "*they were in New Britain, and they started shooting up the car trying to rob them.*" (Emphasis added.) When Bates looked under the seat, she found Taylor's red slide-style cell phone, which looked identical to the cell phone that Taylor had answered while in the house. Taylor then realized that the red slide-style phone he had in his possession was not his phone, and he threw it into a treed area near Bates' driveway, where it later was recovered by police. Bates also took bags out of the trunk of the vehicle, and she and Taylor then removed all of the items from the inside of the vehicle, which included Bates' makeup, her wallet, her coat, the Febreze bottle, a New York Yankees cap, and other things that she could not remember specifically.

Meanwhile, the defendant telephoned his childhood friend, Julian Warren, asking him to come to Bates' home. When Warren arrived, he saw that the defendant was bleeding from his hand. The defendant told Warren that he needed to go to the hospital because he had been shot, but that he did not want to go to a local hospital because he was on parole. Warren, along with another individual, then took the defendant to Queens, New York. During the ride to Queens, Warren heard the defendant say something about being on the news and about "a dude fighting back" and "somebody fighting back."

On September 12, 2012, the police arrested the defendant in New York. After a jury trial, the defendant was found guilty of all charges against him.[3] See also footnote 1 of this opinion. The court sentenced the defendant as follows: (1) for the charge of murder, sixty years incarceration, twenty-five years of which were mandatory; (2) for the charge of conspiracy to commit murder, twenty years incarceration; (3) for the charge of robbery in the first degree, twenty years incarceration, five years of which were mandatory; (4) for the charge of conspiracy to commit robbery in the first degree, twenty years incarceration, five years of which were mandatory; and (5) for the charge of criminal possession of a firearm, five years incarceration, two years of which were mandatory.[4] The court ordered all sentences to run concurrently, resulting in a total effective sentence of sixty years incarceration, twenty-

five years of which were mandatory. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that "[t]here was no evidence from which jurors could reasonably infer that there was a robbery or an agreement to commit robbery." He argues: "[T]he state's evidence proved only that something went wrong during a planned drug deal between the parties that [led] to the shooting of [the victim]. The state did not introduce any evidence at trial from which the jury could reasonably infer that [the defendant] intended to rob [the victim], or that there was an agreement between him and Taylor to rob [the victim]." We disagree.

We employ the following standard in our analysis of the defendant's claim: "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [w]here a group of facts are relied upon for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt. . . .

"As we have often noted, however, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead,

whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 311 Conn. 408, 419–20, 87 A.3d 1101 (2014).

The defendant argues that the state failed to introduce any evidence that the defendant robbed, or intended to rob, the victim. He contends: "It is undisputed that something went wrong during the [drug] transaction, but there was no evidence presented at trial that [the defendant] agreed or intended to take drugs from [the victim] without paying for them." We disagree.

"A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery . . . he or another participant in the crime . . . is armed with a deadly weapon . . . ." General Statutes § 53a-134 (a) (2). "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119.

"To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citations omitted; internal quotation marks omitted.) *State* v. *Danforth*, 315 Conn. 518, 531–32, 108 A.3d 1060 (2015).

"[T]he existence of a formal agreement between the conspirators need not be proved [however] because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite

agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . Finally, [b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) Id., 532–33.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to support the defendant's conviction of the crimes of robbery in the first degree and conspiracy to commit robbery in the first degree. The defendant challenges only the larceny element of these charges, arguing that there was no evidence that he intended to take drugs from the victim without paying for them or that he agreed to do so.

The evidence in this case demonstrated that the defendant made an agreement to buy cocaine from the victim for the sum of $6150. As the victim approached the defendant's vehicle, the victim was carrying crack cocaine in a brown paper bag, which was tucked in his waistband. He then leaned into the rear passenger's side of the vehicle, with his feet hanging out. A struggle ensued, and the victim attempted to hold the defendant's arm in an effort to avoid being shot. Shots, however, were fired, ultimately resulting in the death of the victim. Jackson and Angelo both ran to help. Jackson grabbed a child's scooter and broke the front passenger's side window of the vehicle, and he engaged Taylor, who was sitting in that seat, in a fight.

In the meantime, Angelo ran to the rear passenger's side of the vehicle to help the victim, but soon more shots were fired. Angelo then went to the driver's side of the vehicle, where he encountered the defendant, who was standing outside of the vehicle, holding a revolver then pointed toward Angelo's face. Taylor indicated to the defendant that they should leave. The defendant and Taylor reentered the vehicle and fled the scene with the crack, with the rear door open, and with the dying victim only partially inside the vehicle. The victim later fell out or was pushed out of the vehicle, and was left to die on the street. When the victim was transported to the hospital, he had approximately $40 on him.

Later, as Bates and Taylor were cleaning the vehicle, which was littered with broken glass, blood, and many different sized pieces of crack cocaine mixed with blood and glass, Taylor specifically told Bates that "*they were in New Britain, and they started shooting up the car trying to rob them.*" (Emphasis added.) Additionally,

when Warren was driving the defendant to Queens, the defendant said something about being on the news and about "*somebody fighting back*." (Emphasis added.)

Although Bates' statement that Taylor told her that "*they were in New Britain, and they started shooting up the car trying to rob them*" could be viewed as ambiguous, it is within the province of the jury to ascertain the reasonable meaning of that statement. See, e.g., *State* v. *Leniart*, 166 Conn. App. 142, 172 n.21, 140 A.3d 1026 ("The jury was free to interpret the defendant's statement that he wanted 'to do her' either as an expression of his intent to have sexual intercourse with [the victim] or as an expression of his intent to kill her. In either instance, when considered in light of the defendant's statement that he 'need[ed] a body for the altar,' the jury reasonably could have inferred that his ultimate plan was to kill [the victim]."), cert. granted on other grounds, 323 Conn. 918,     A.3d     (2016).

Our role on appeal is to "construe the evidence in the light most favorable to sustaining the verdict. . . . [We then] determine whether *upon the facts so construed* and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . " (Emphasis added; internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014).

Here, it certainly would have been reasonable for the jury to have found that the "they" to whom Bates referred was the defendant and Taylor, especially because it was Taylor who had been speaking to Bates. Furthermore, it would have been reasonable for the jury to have found that when Warren heard the defendant say that "*somebody*" fought back, the defendant was referring to the victim in this case having fought back an attack. There also was evidence that the victim had only $40 on him when he was transported to the hospital, despite the defendant stating that he had given the victim $6000. Thus, on the basis of this evidence, the jury reasonably could have concluded that the defendant and Taylor coaxed the victim to produce 150 grams of crack cocaine by telling him that they would pay him $6150, and, once he produced the crack, they forcibly took it from him without ever paying him the agreed upon $6150. The victim resisted being robbed and fought back. The defendant and Taylor then killed the victim, dumped his body in the street, and simply drove away.

Our case law is clear: "[I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required

to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Leniart*, supra, 166 Conn. App. 170.

Viewing the evidence in the light most favorable to sustaining the jury's verdict, as we must, we conclude that the jury reasonably could have found, on the basis of the evidence presented and the reasonable inferences drawn therefrom, that the defendant and Taylor had robbed the victim, who fought back, and that they had planned and intended to do so. Accordingly, we find no merit to the defendant's claim.

## II

The defendant next claims that the court improperly instructed the jury on the elements of conspiracy to commit robbery in the first degree. Specifically, he argues in his principle brief that because the court failed to instruct the jury that the coconspirators had to agree that a firearm would be used, his conviction for conspiracy to commit robbery in the first degree must be vacated. In response, the state agrees that this conviction must be vacated, but for a different reason than the defendant offers. The state argues that because the conspiracy to commit robbery and the conspiracy to commit murder conviction arise from the same agreement, a double jeopardy violation exists. In his reply brief, the defendant agrees with the state. We, too, agree that a double jeopardy violation exists and that the conspiracy to commit robbery conviction and sentence must be vacated.

In this case, the defendant was convicted of both conspiracy to commit murder and conspiracy to commit robbery in the first degree, both crimes that arose from a single agreement with multiple objectives. "[U]nder Connecticut law; see, e.g., *State* v. *Ortiz*, 252 Conn. 533, 559, 747 A.2d 487 (2000); it is a double jeopardy violation to impose cumulative punishments for conspiracy offenses if they arise from a single agreement with multiple criminal objectives. Furthermore, the state recognizes that, pursuant to the United States Supreme Court's decision in *Rutledge* v. *United States*, 517 U.S. 292, 302, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996), a cumulative conviction can be a form of punishment in and of itself because it may lead a defendant to suffer adverse collateral consequences." (Footnote omitted.) *State* v. *Wright*, 320 Conn. 781, 828–29, 135 A.3d 1 (2016).

Pursuant to *State* v. *Wright*, supra, 320 Conn. 829, which extended the holding in *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013) (vacatur is appropriate remedy for cumulative conviction in cases involving greater and lesser included offenses), the appropriate

remedy for such a double jeopardy violation is vacatur. Accordingly, the defendant's conviction and accompanying sentence on the charge of conspiracy to commit robbery in the first degree must be vacated. See *State v. Mendez*, 154 Conn. App. 271, 281, 105 A.3d 917 (2014); *State v. Wright*, 144 Conn. App. 731, 749, 73 A.3d 828 (2013), aff'd, 320 Conn. 781, 135 A.3d 1 (2016).

### III

The defendant's final claim is that the court committed plain error by failing to instruct the jury on accomplice or informant testimony with respect to Bates. Specifically, he claims that because Bates had been charged with tampering with evidence for helping to clean the car after the murder of the victim, "she had the same motive to curry favor with the prosecution as an accomplice to the murder." As such, the court was required to tell the jury to scrutinize her testimony carefully. Alternatively, the defendant also requests that we review the claim pursuant to our supervisory authority.

The state argues that the court had no duty to give an instruction on this testimony, sua sponte, and, furthermore, that the claim is not reviewable for plain error because the defendant waived any claim of error. The state also argues that it would be inappropriate for us to review this claim under our supervisory authority.

In his reply brief, the defendant argues that "[o]ur Supreme Court has not, as of the date of this writing, held that plain error review is unavailable even if the court determines that there has been a waiver of a claim pursuant to *State v. Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011). See *State v. McClain*, 319 Conn. 902, 122 A.3d 637 (2015) ([granting certification to review issue of whether 'Appellate Court properly determine[d] that an implied waiver of a claim of instructional error that satisfies [*Kitchens*] . . . also forecloses plain error review'])." He also argues that we would be justified in exercising our supervisory authority in this case. We conclude that the defendant waived this claim, and we also decline to exercise our supervisory authority.

In this case, the defendant concedes that his claim of instructional error is not preserved "due to his failure to submit a request to charge [on this specific instruction] and to object to the court's charge." He also concedes that "*Golding* review is not available because the issue is not one of constitutional magnitude." See *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Accordingly, he requests that we consider his claim pursuant to the plain error doctrine or that we exercise our supervisory authority. We conclude that the defendant's claim is not reviewable for plain error, and we decline his invitation to exercise our supervisory authority.

This court repeatedly has held that an implied waiver

of a claim of instructional error that satisfies *State* v. *Kitchens*, supra, 299 Conn. 482–83, also forecloses plain error review. See, e.g., *State* v. *Bialowas*, 160 Conn. App. 417, 429, 125 A.3d 642 (2015); *State* v. *Jackson*, 159 Conn. App. 670, 677–79, 123 A.3d 1244 (2015); *State* v. *Fuller*, 158 Conn. App. 378, 390–91, 119 A.3d 589 (2015); *State* v. *McClain*, 154 Conn. App. 281, 291–92, 105 A.3d 924, 931 (2014), cert. granted, 319 Conn. 902, 122 A.3d 637 (2015); *State* v. *Reddick*, 153 Conn. App. 69, 82, 100 A.3d 439, appeal dismissed, 314 Conn. 934, 102 A.3d 85, cert. denied, 315 Conn. 904, 104 A.3d 757 (2014). These decisions, at least in part, relied upon our Supreme Court's observation in *Kitchens* that "a valid waiver precludes a finding that a jury instruction constitutes plain error because a valid waiver means that there is no error to correct." *State* v. *Kitchens*, supra, 299 Conn. 474 n.18. Because the defendant waived his right to raise the present claim of instructional error, he is foreclosed from seeking consideration under the plain error doctrine.

As for the defendant's request that we exercise our supervisory authority to review his claim of instructional error, we decline to do so. "[B]ypass doctrines permitting the review of unpreserved claims such as [*State* v. *Golding*, supra, 213 Conn. 233] and plain error, are generally adequate to protect the rights of the defendant and the integrity of the judicial system . . . . [T]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine. Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . Thus, a defendant seeking review of an unpreserved claim under our supervisory authority must demonstrate that his claim is one that, as a matter of policy, is relevant to the perceived fairness of the judicial system as a whole, most typically in that it lends itself to the adoption of a procedural rule that will guide the lower courts in the administration of justice in all aspects of the criminal process." (Internal quotation marks omitted.) *State* v. *Leach*, 165 Conn. App. 28, 35–36, 138 A.3d 445 (2016).

In the present case, although the defendant asserts that we should adopt a rule that requires the trial court to give a special credibility instruction in cases where a state's witness has been promised a benefit in exchange for his or her testimony, our Supreme Court already has rejected such a request.

In *State* v. *Diaz*, 302 Conn. 93, 113–14, 25 A.2d 594 (2011). our Supreme Court took the "opportunity to reaffirm the well established common-law rule that it is within the discretion of a trial court to give a cautionary

instruction to the jury whenever the court reasonably believes that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel. In determining whether to give such an instruction, the trial court may consider the circumstances under which the witness came forward; the seriousness of the charges with which the witness has been charged or convicted; the extent to which the state is in a position to provide a benefit to the witness and the potential magnitude of any such benefit; the extent to which the witness' testimony is corroborated by other evidence; the importance of the witness' testimony to the state's case; and any other relevant factor. . . . Because the trial courts already have the discretion to give a special credibility instruction under existing case law, there is no need for this court to create a new supervisory rule requiring a special credibility instruction in cases where there is evidence that the witness is particularly unreliable." (Citation omitted.) Pursuant to this precedent, we decline to consider the defendant's request.

The judgment is reversed only with respect to the conviction of conspiracy to commit robbery in the first degree and the case is remanded with direction to vacate that conviction and its accompanying sentence; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The defendant also was convicted of felony murder in violation of General Statutes § 53a-54c. The court, however, vacated that conviction on January 9, 2015, pursuant to *State* v. *Miranda*, 317 Conn. 741, 120 A.3d 490 (2015) (holding that vacatur is appropriate remedy for cumulative homicide convictions for murder and felony murder arising from killing of single victim).

[2] A bullet recovered from an area near where the vehicle was positioned and the two bullets recovered from the victim's body were fired from the same revolver. The revolver, however, was not recovered.

[3] At trial, the defendant testified on his own behalf. He claimed that this incident was a drug deal gone wrong, rather than a robbery, and that he was with an individual he knew only as "Cash" or "Dove," rather than with Taylor.

The defendant testified that, originally, he had made an agreement with the victim to purchase $6150 worth of drugs. When the defense counsel asked him if he gave the victim the money in exchange for the drugs, the defendant responded: "Yeah, not the $6150 because when I got there . . . it was supposed to be coke, 100 grams coke, 50 grams crack. . . . But he told me that he cooked all the coke up and made all crack. . . . So . . . [the victim] took $150 off . . . so, I gave him $6000 . . . ." The defendant explained that $4000 was his money, and Cash supplied the remaining $2000 for the purchase.

The defendant then testified that despite having paid the victim $6000 for 150 grams of crack, the victim only gave them 100 grams. When he and Cash discovered that they had been shorted, they confronted the victim, things got heated between Cash and the victim, and a struggle ensued. Cash had a gun and during the struggle, the gun went off multiple times. He testified that, in the midst of this struggle, he, Cash and the victim all got shot. He further testified that, as this was occurring, Jackson ran toward the vehicle and shot out the front passenger side window with a gun.

The jury was not required to credit this version of events, and, as we explain later in this opinion, the evidence the jury reasonably could have credited established the defendant's guilt beyond a reasonable doubt.

[4] On appeal, the defendant does not challenge the judgment of conviction

on the murder count or on the criminal possession of a firearm count.

_____